# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| RORY J. CUTAIA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:11cv00077 |
| | ) | |
| v. | ) | |
| | ) | |
| RADIUS ENGINEERING, | ) | By: Michael F. Urbanski |
| INTERNATIONAL, INC., et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court on defendant Radius Engineering International, Inc.'s ("Radius") Motion for Judgment as a Matter of Law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure (Dkt. # 314). In this motion, Radius asserts that the jury's liability verdict on plaintiff Rory J. Cutaia's ("Cutaia") breach of warranty, fraud and Virginia Consumer Protection Act claims was undermined by the lack of any damages awarded by the jury on those claims, and that the jury's award of $1,762,087.40 in damages on the breach of contract claim was grossly excessive and unsupported by the evidence. For the reasons that follow, Radius' motion is **DENIED**.

## I.

Cutaia entered into an oral contract with Radius for the manufacture of a custom built underground survival shelter to be installed on his property in Augusta County, Virginia. Cutaia testified that he paid "over $2 million in connection with the shelter."[1] Cutaia Trial Testimony, Dkt.

---

[1] One of the many peculiar aspects of this case is that, although it involved vast sums, there was no executed written contract. Cutaia testified that "[t]here were many proposed contracts that he gave me that I never executed. Each one had a problem in it. Just kept having more problems and things I couldn't live with. So we ended up moving forward without a written contract." Cutaia Trial Testimony, Dkt. # 319, at 57. Radius' principal, Walton McCarthy, testified that he believed the parties performed consistent with an unsigned document entitled "Sale of Goods Agreement Phase 1 Rev. 1 ETHOS WMD Underground Community," introduced into evidence as Defendant's Ex. 54. McCarthy Trial

# 319, at 212. Radius manufactured the components of the survival shelter in Texas and shipped them to Cutaia's property. Those components included a living pod, a generator pod and the main structure, an Earthcom Dome 60. The Earthcom Dome 60 was a fiberglass dome manufactured by Radius in pie-shaped sections which were shipped to the construction site, where they were assembled and buried by Green Eye Technology, LLC ("Green Eye"), Radius' exclusive installer.[2] Witnesses associated with Green Eye testified that they had difficulty assembling the pieces of the dome to assure a water-tight fit and bemoaned the lack of adequate assembly instructions[3] and quality of the Radius components. For its part, Radius blamed the problems with the dome on Green Eye's faulty installation. The evidence adduced at trial indicated there were gaps between the pie-shaped sections of the dome and cracks around the circular foundation of the dome. At Radius' instruction, Green Eye attempted to seal the gaps between the dome sections with a non-waterproof filler material akin to that used in auto body repairs.[4] At the end of the day, the evidence established that the dome leaked water through the seams of the vertical dome sections and between the dome and the foundation. Without completing the installation, Green Eye abruptly quit the project.[5]

---

Testimony, Dkt. # 320, at 22-23; Dkt. # 283-11. In any event, Radius submitted invoices to Cutaia, which he paid. See Dkt. # 273-5.

[2] When installed, the Earthcom Dome 60 measured 60 feet across and stood 22 feet high at its center.

[3] There was a conflict in the evidence at trial as to the sufficiency of the written installation instructions provided by Radius to Green Eye. Green Eye's George Welhaf, III dismissed the Radius assembly instructions as follows: "Walton's written instructions? They're not instructions. You build a bird house with those instructions." Welhaf Trial Testimony, Dkt. # 321, at 74.

[4] The engineering experts on each side agreed that the auto body filler (referred to alternatively at trial as Bondo or Valspar) was not a waterproofing agent and could degrade when exposed to water. Holland Trial Testimony, Dkt. # 311 at 37; Mroszczy Trial Testimony, Dkt. # 312, at 101-03, 127-28.

[5] The circumstances surrounding Green Eye's hasty retreat from the Cutaia project are less than favorable to Green Eye. Although not the principal subject of the trial, it was contended that a Green Eye employee drove a large piece of construction equipment over the buried living pod, crushing it, and left the hatch to the generator pod open, causing it to fill with rain water. On the eve of trial, Green Eye's insurer withdrew its defense, causing Green Eye to consent to a default judgment as to Cutaia's breach of contract claim. Consent to Entry of Default on Count II, Dkt. # 262. Cutaia thereupon dismissed its fraud in the inducement and Virginia Consumer Protection Act claims against Green Eye. Stipulation of Dismissal, Dkt. # 263. At trial, Green Eye's principal, George Welhaf, III, testified as a rebuttal witness for Cutaia.

2

Cutaia engaged a local contractor to cover the dome with a membrane and take steps to divert water away from the dome. Cutaia's evidence was that the dome continued to leak water, became moldy and could not be repaired. As such, Cutaia argued that it was utterly unsuitable as a survival shelter.

A bifurcated jury trial was conducted over eight days in October, 2013. On liability, the jury returned a verdict for Cutaia against Radius on all six counts.[6] At the damages phase, Cutaia sought recovery for the value of the dome, as reflected in the monies he paid to have it manufactured and installed.[7] Cutaia presented evidence at the damages phase as to the amounts he paid to have the Earthcom Dome 60 manufactured and installed, and asked the jury to award a total of $1,807,087.50. For its part, Radius asserted that the dome could be made watertight by the interior application of fiberglass and water-activated urethane foam at a cost of $30,000 to $35,000. The jury awarded Cutaia damages for breach of contract in the amount of $1,762,087.40,[8] but penned in "$Ø" for the five remaining counts. See Damages Verdict Form, Dkt. # 297.

In its Rule 50(b) motion, Radius argues that the jury's award of $1,762,087.40 is factually unsupported and contrary to law, and asserts that the proper measure of damages is $100,980.[9] Radius also asserts that the jury's award of this vast sum for breach of contract is inconsistent with

---

[6] The jury found that Cutaia proved his breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for particular purpose, fraud in the inducement and breach of the Virginia Consumer Protection Act ("VCPA") claims by a preponderance of the evidence.

[7] Although the generator and living pods were of no use to Cutaia without a functional main dome structure, Cutaia did not seek recovery of damages for the cost of those pods from Radius, ostensibly because the damage to those units lay at the hands of Green Eye.

[8] The jury verdict of $1,762,087.40 was $45,000 less than Cutaia requested. Cutaia argues that the $45,000 difference between what he sought and what the jury awarded strongly suggests that the jury chose not to award Cutaia the $45,000 he sought for core drilling. As the cost of the core drilling is the only element of claimed damages in this precise amount, Cutaia's supposition makes some sense. Regardless of the precise amount awarded, it is clear that the jury based its damages award on the amount of money Cutaia paid for the Earthcom Dome 60, rather than the much smaller amount Radius contended it would take to repair the leaks in the dome.

[9] This sum consists of $35,000 to seal the inside of the dome with fiberglass and urethane foam, $38,400 for the cost of the Multi-Chamber Air Sterilization system Cutaia asserts was never delivered, and $27,580 for a periscope Cutaia likewise asserts he did not receive.

3

the award of \$Ø for the breach of warranty counts, and that the award of \$Ø on the fraud and VCPA counts negates the liability finding on those claims.

## II.

Rule 50(b) of the Federal Rules of Civil Procedure allows the parties to renew a motion for judgment as a matter of law made under Rule 50(a) following a jury verdict and judgment. A district court should grant a Rule 50(b) motion only if the court "determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 532 (4th Cir. 2002) (quoting Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999)). In ruling on the motion, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001). The court may not substitute its judgment for that of the jury and must uphold the verdict if there is evidence upon which a reasonable jury could return a verdict in favor of the nonmoving party. Price v. City of Charlotte, 93 F.3d 1241, 1249-50 (4th Cir. 1996). At the same time, while a court is "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, [it is] not a rubber stamp convened merely to endorse the conclusions of the jury, but rather [has] a duty to reverse the jury verdicts if the evidence cannot support it." Id. at 1250 (internal citations omitted). With regard to damages, the power and the duty of the district court to set aside an excessive verdict is "well-established, the exercise of the power being regarded not in derogation of the right of trial by jury but one of the historic safeguards of that right." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 304 (4th Cir. 1998) (quoting Virginian Ry. Co. v. Armentrout, 166 F.2d 400, 408 (4th Cir. 1948)). "The determination of damages is left to the discretion of the jury, to be reviewed by the district court in accordance with federal standards of review under Rule 50(b) and Rule 59. The award shall stand unless no substantial evidence is presented to support it, it is against the clear weight of the

4

evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice." Barber v. Whirlpool Corp., 34 F.3d 1268, 1279 (4th Cir. 1994). "'[A]n award of substantial compensatory damages . . . must be proportional to the actual injury incurred . . . . The award must focus on the real injury sustained . . . .'" Hetzel v. County of Prince William, 89 F.3d 169, 173 (4th Cir. 1996) (quoting Piver v. Pender County Bd. of Educ., 835 F.2d 1076, 1082 (4th Cir. 1987)).

## III.

Radius argues that the jury's finding of no damages on the fraud in the inducement and VCPA claims requires entry of judgment as a matter of law in Radius' favor on those claims. Radius also argues that the jury's finding of no damages on the warranty claims undermines the breach of contract damages award. In considering this issue, it is the duty of the court "to determine whether a jury verdict can be sustained, on any reasonable theory." Atlas Food Sys. & Servs. Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 599 (4th Cir. 1996) (quoting Richardson v. Suzuki Motor Co., 868 F.2d 1226, 1246 (Fed. Cir. 1989)). "And it must, therefore, harmonize seemingly inconsistent verdicts if there is any reasonable way to do so." Id. (citing Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963)).

In this case, the jury's answers to special interrogatories at the liability and damages phases can be reasonably harmonized. Finding against Radius on all of Cutaia's liability theories, the jury next proceeded to follow the court's damages instruction to "determine an amount of money that you find to be justified by a preponderance of the evidence as full, just and reasonable compensation for all of the plaintiff's damages, no more and no less." Damages Jury Instructions, Dkt. # 306-1, at 3. Having awarded Cutaia his full measure of damages on the breach of contract count, the jury may well have reasonably concluded that to award additional amounts on the other counts would result in a duplicative recovery. In other words, it is reasonable to read the jury's damages award on the breach of contract claim not so much as undermining its liability verdict on the other claims as

Case 5:11-cv-00077-MFU-RSB   Document 339   Filed 07/09/14   Page 5 of 21   Pageid#: 8299

reflecting its decision that the $1,762,087.40 awarded on the breach of contract claim represents the full measure of compensatory damages for all six claims.[10]

Other courts, faced with similar issues, have likewise reconciled the jury's responses to liability and damages interrogatories in multi-count cases. For example, in Allstate Ins. Co. v. Plambeck, No. 3:08CV388M, 2014 WL 1303000 (N.D. Tex. Mar. 31, 2014), the court rejected defendants' argument that a new trial was warranted because the jury's verdict was inconsistent and irreconcilable. In Plambeck, the jury found defendant liable on fraud, unjust enrichment and RICO claims, but only awarded damages for the RICO claim. The court rejected defendants' post-trial claim that the verdict could not be reconciled, citing the Fifth Circuit's decision in Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 781 (5th Cir. 1986), as follows: "[W]e have no difficulty reconciling the jury's verdict in the instant case. The jury might well have concluded that Holt would unjustifiably receive a double recovery if damages were awarded under both theories of recovery." 2014 WL 130300, at *7. That reasoning applies equally to the jury's decision in this case.[11] As such, the court will harmonize the jury's verdict by entering judgment for $1,762,087.40 on the breach of contract claim only. As will be explained in detail below, this damages award will fully compensate Cutaia for the damages he sustained.

---

[10] Prior to the submission of the damages verdict form to the jury, the court discussed the issue of the format of the damages verdict form with the parties. Damages Phase Transcript, Dkt. # 313, at 60-63. Counsel for Radius indicated his preference for having the verdict form contain six blanks for damages, one for each count. Id. at 62. The court, while expressing some concern over the possibility of a duplicative verdict, indicated that it would provide the jury with a damages verdict form containing a blank for each count. If it turned out that the verdict appeared duplicative, the court indicated that it would sort that out following the verdict. Id. at 62-63.

[11] See also Zwerin v. Maccabees Mut. Life Ins. Co., 111 F.3d 140, 1997 WL 191490, at *5 (10th Cir. 1997) (unpublished) (affirming district court's rejection of theory that jury's verdict was inconsistent "because the jury awarded no damages for fraud although it found Zwerin had committed fraud," finding instead that "jury had simply followed its admonition not to duplicate damages"). But see AIG Aviation, Inc. v. Booroom Aviation, Inc., Nos. 96-1503, 96-1563, 96-1582, 1998 WL 69013, at *4-6 (6th Cir. Feb. 11, 1998) (awarding plaintiff a new trial on RICO damages where the jury's answers to special interrogatories found RICO liability, but no damages). Here, plaintiff has not moved for a new trial on these grounds, and, as the court is able to reconcile the liability and damages verdicts, no new trial will be ordered.

Case 5:11-cv-00077-MFU-RSB Document 339 Filed 07/09/14 Page 6 of 21 Pageid#: 8300

# IV.

In Virginia,[12] a successful plaintiff in a breach of contract case is entitled to recover those damages which are "the natural and direct result of the breach of the contract." <u>Manss-Owens Co. v. H.S. Owens & Son</u>, 129 Va. 183, 201, 105 S.E. 543, 549 (1921).[13] "The object of the law in awarding damages is to make amends or reparations by putting the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed." <u>Lehigh Portland Cement Co. v. Va. S.S. Co.</u>, 132 Va. 257, 270, 111 S.E. 104, 109 (1922). "Direct damages are those which arise naturally or ordinarily from a breach of contract and which, in the ordinary course of human experience, can be expected to result from the breach." <u>Transdulles Ctr., Inc. v. USX Corp.</u>, 976 F.2d 219, 226 (4th Cir. 1992) (citing <u>Roanoke Hosp. Ass'n v. Doyle &</u>

---

[12] In this diversity case, Virginia law governs.

[13] While the oral contract between Radius and Cutaia breached in this case principally involved the sale of goods, and is thus subject to Virginia's Commercial Code, Radius also provided services related to the installation of the dome. Cutaia testified that Radius' Walton McCarthy "was intimately involved in the installation." Cutaia Trial Testimony, Dkt. # 319, at 160. McCarthy testified consistently that Radius and Green Eye talked almost daily on the project, and that "a lot of the instruction was just verbal." McCarthy Trial Testimony, Dkt. # 324, at 15, 21. Moreover, Cutaia testified that Radius played a role in identifying an appropriate parcel of property necessary for the dome. Cutaia Trial Testimony, Dkt. # 319, at 101-03. Radius personnel fiberglassed the joints on the fiberglass foundation pan for the principal structure of the survival shelter, the underground dome, on site in Augusta County. McCarthy Trial Testimony, Dkt. # 324, at 11. Further, when the pie-shaped pieces of the dome shell did not fit together snugly, Radius' McCarthy flew to the site from Texas and instructed the installer, Green Eye, to fill the gaps with an auto body filler. <u>Id.</u> at 27-35. Concerning the fiberglassing of the inside vertical seams of the dome, McCarthy admitted that certain of the sales documentation indicated that the "external seams will be glassed on site by Radius." <u>Id.</u> at 17-18. On this same issue, McCarthy testified that if Green Eye "couldn't do it, we would help them with it or we would do it ourself. But one way or another, it would get done." <u>Id.</u> at 17. Finally, there was evidence that Green Eye was Radius' exclusive installer, and that Cutaia had no choice but to contract with Green Eye for the installation. McCarthy Trial Testimony, Dkt. # 324, at 64. In short, Radius' role in the construction of this survival shelter transcended that of a mere supplier of goods. Thus, the contract at issue here was mixed, involving both goods and services. <u>See, e.g., Princess Cruises, Inc. v. Gen. Elec. Co.</u>, 143 F.3d 828, 832-33 (4th Cir. 1998). In such circumstances, whether the Uniform Commercial Code applies "hinges on the predominant purpose of the transaction, that is, whether the contract primarily concerns the furnishing of goods or the rendering of services." <u>Id.</u> at 833. Applying that test, it is clear that the U.C.C. is applicable to this case as it predominantly concerned a sale of goods by Radius to Cutaia, and the court instructed the jury consistent therewith. Virginia Code § 8.2-714(1) provides that a buyer of nonconforming goods may recover "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." In cases involving the U.C.C., "the Supreme Court of Virginia continues to use the common law definition of direct and consequential damages." <u>Kraft Foods N. Am., Inc. v. Banner Eng. Sales, Inc.</u>, 446 F. Supp. 2d 551, 572 (E.D. Va. 2006). Consistent with Virginia law, the jury was instructed as follows: "With respect to Radius' liability for breach of contract, plaintiff is entitled to recover as damages all of the losses he sustained that are a natural and ordinary result of the breach and that he has proved by the greater weight of the evidence." Damages Jury Instructions, Dkt. # 306-1, at 4. The principal issue raised by Radius in its Rule 50(b) motion is whether Cutaia's evidence of direct damages was sufficient to meet this standard.

Russell, Inc., 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975)).  "The measure of direct damages is the

cost to complete the contract according to its terms, or . . . the cost of repair to meet the contract

terms."  Id. (citing Lochaven Co. v. Master Pools By Shertle, Inc., 233 Va. 537, 544, 357 S.E.2d 534,

538 (1987)).  "Damages need not be established with mathematical certainty.  Rather, a plaintiff is

required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent

and probable estimate of the damages sustained."  Taylor v. Flair Prop. Assoc., 248 Va. 410, 414,

448 S.E.2d 413, 416 (1994).

Radius does not take issue with these well-established tenets of Virginia law, nor does it take

issue with the court's damages jury instructions.[14]  Rather, Radius asserts that the $1.7 million verdict

amounted to recoupment of Cutaia's out-of-pocket costs and, as such, was inconsistent with both

Virginia law and the court's instructions.[15]  Radius argues that under the court's instructions, and

consistent with Virginia law, the jury should have awarded damages limited to the cost of repairing

the leaky Earthcom Dome 60, which it posited could be done for $30,000-35,000.[16]

## A.

Likening this to a "leaky basement" case, Radius contends that the cost of repair is the

appropriate measure of damages, as those damages are the natural and direct result of the breach of

contract.  In so arguing, Radius focuses on a number of Virginia decisions concerning the proper

---

[14] Radius raised no objection at trial to the court's damages instructions; nor does it do so now.  "Defendant does not challenge the Court's instructions to the jury, but rather the manner in which the jury calculated damages."  Radius' Rule 50(b) Br., Dkt. # 315, at 6.

[15] In fact, in closing argument on damages, Cutaia's counsel stated as follows:  "Now, Mr. Cutaia's just seeking basically to get his costs back related to this dome.  He's basically looking for a refund, a refund of the costs that he paid to Radius, a refund of the costs that he paid to Green Eye, a refund of the costs he paid directly related to the dome."  Damages Phase Trial Transcript, Dkt. # 313, at 68.

[16] Cutaia argues that Radius waived his Rule 50(b) motion as to the amount of damages awarded by not raising this issue at trial pursuant to Rule 50(a).  Cutaia is wrong.  Radius argued at the close of the evidence on damages that the proper measure of damages was the cost of repairing the dome and that there was no basis for Cutaia's position that the dome was worthless.  Damages Phase Transcript, Dkt. # 313, at 54.

8

measure of damages for a breach of contract claim arising in a construction setting. Even under this line of cases, however, the evidence adduced at trial supports the jury's damages verdict.

1.

Virginia law provides two methods for determining direct damages in a breach of construction contract case.

> These have come to be commonly designated as the "cost rule" which is "the cost of correcting the defects in the [construction] and making it conform to the terms of the contract" and the "value rule" which is "the difference between the value of the [structure] properly completed according to the contract and the value of the defective structure."

Nichols Constr. Corp. v. Va. Mach. Tool Co., LLC, 276 Va. 81, 89, 661 S.E.2d 467, 472 (2008).

Nichols Construction concerned a dispute between the owner of an industrial building and a roofing contractor over the installation of a new roof on the building. Nichols Construction installed a new roof on Virginia Machine Tool's building for $140,000. The trial court concluded that the roof was defective and could only be fixed by removing and replacing it, at a cost of $450,842. Nichols Construction argued that the award of damages to replace the roof was excessive and that the damages should be limited to the amount of the contract price. Noting that the repair of the defective roof was not a reasonable option, the Virginia Supreme Court affirmed the trial court's award of the cost to remove the defective roof and install a new one, concluding that this "was the object of the original contract." Id. at 91, 661 S.E.2d at 473.

In addressing the proper measure of damages, Nichols Construction relied on the 1950 Virginia case of Mann v. Clowser, 190 Va. 887, 903, 59 S.E.2d 78, 85-86 (1950). In Mann, the Virginia Supreme Court cited Williston on Contracts, the Restatement of the Law of Contracts and Judge Cardozo in Jacobs & Young, Inc. v. Kent, 230 N.Y. 239, 129 N.E. 889 (1921), for the proposition that if the structure constructed could not be repaired in accordance with the contract, if the repairs would involve unreasonable economic waste, or if the cost of completion is grossly and

9

unfairly out of proportion to the good to be attained, the proper measure of damages is the difference in value of the defective structure and that of the structure properly completed. See also Lochaven Co. v. Master Pools by Shertle, Inc., 233 Va. 537, 543, 357 S.E.2d 534, 538 (1987); Green v. Burkholder, 208 Va. 768, 771, 160 S.E.2d 765, 767 (1968); Kirk Reid Co. v. Fine, 205 Va. 778, 786-88, 139 S.E.2d 829, 835-36 (1965). These cases teach that "the rule to be followed in a particular case depends upon the character and extent of the defective construction." Mann, 190 Va. at 904, 59 S.E.2d at 86. "Accordingly, the determination of damages for a breach of contract will always be fact specific, and no single method exists for calculating the amount necessary to place the plaintiff in the position he would have occupied had the breach not occurred." Nichols Constr., 276 Va. at 89, 661 S.E.2d at 472 (citing Appalachian Power Co. v. John Stewart Walker, Inc., 214 Va. 524, 535, 201 S.E.2d 758, 767 (1974)). In an appropriate case, where the facts suggest that "the defect was not remediable from a practical standpoint, . . . the difference in value was the proper rule." Barcroft Woods, Inc. v. Francis, 201 Va. 405, 410, 111 S.E.2d 512, 517 (1959); see also Lochaven Co., 233 Va. at 544, 357 S.E.2d at 538 ("[T]he cost measure of damages will not be awarded in cases where the property must be substantially demolished before it can be brought into compliance with the contract provision or in cases where the cost of compliance is grossly disproportionate to the benefit to be achieved.").

**2.**

The jury was squarely faced with the factual question of whether the Earthcom Dome 60 could be repaired, and if so, at what cost. Radius' McCarthy testified that the Earthcom Dome 60 could be repaired for the relatively modest sum of $30,000 to $35,000 by fiberglassing the vertical seams where the pie-shaped dome segments met, and sealing the base of the dome with water-activated urethane foam used in nautical applications. Radius' Engineering expert, John Mroszczy, Ph.D., concurred. On the other hand, Cutaia presented evidence that the Earthcom Dome 60 was

10

defective beyond all practical repair. In particular, Cutaia relies on the testimony of David Stott, a general contractor hired by Cutaia who unsuccessfully attempted to rectify the problem of water infiltrating the dome; Dano Holland, an engineering expert who testified that the dome could not be made watertight to any degree of confidence without removing it from the ground and reassembling it; and Cutaia's own testimony that the Earthcom Dome 60 was not usable as a survival shelter as it was constantly leaking water, moldy and beyond repair. In addition to the problem of water infiltration, Cutaia testified that he contracted with Radius for a survival shelter that was protected from electromagnetic pulses emitted from high altitude nuclear denotation ("EMP"), when, in fact, the evidence showed that the dome Radius sold him could not even shield local radio broadcasts.

Cutaia's contractor, David Stott, testified at trial as to the work he performed at Cutaia's request to attempt to salvage the survival shelter after the installer, Green Eye, abruptly quit the project. Stott testified that he observed water and mud on the floor of the dome and a circular crack in the concrete floor that travelled almost all the way around the perimeter of the dome. Stott Trial Testimony, Dkt. # 334, at 6-9. Stott described for the jury photographs he took showing water infiltration and mold in the dome. Id. at 12, 20-21, 43.[17] Stott testified and showed the jury pictures of water leaking into the dome from the vertical seams of the dome sections and the bolt holes where the pie-shaped vertical sections were bolted together. Id. at 22-26. Stott testified that he took various steps to try to alleviate the water infiltration into the dome by rerouting drains, regrading the area around the dome and covering the dome with a rubber membrane left on site by Green Eye. Id. at 28-29. These efforts were not successful in stopping the water infiltration into the dome. Id. at 29.

---

[17] Stott testified that during his last visit to the dome in the spring of 2013, he noticed more mold than water and noted that "[t]he mold was really kind of creeping me out." Id. at 43.

11

Cutaia's expert, Dano Holland, a forensic structural engineer, testified as to the circular crack in the foundation of the dome and also as to water infiltration into the Earthcom Dome 60. Holland testified that he observed water weeping out from the interface between the concrete floor slab and the fiberglass shell of the dome. Holland Trial Testimony, Dkt # 311, at 34. Holland also testified to water infiltration in the areas where the dome shell sections were bolted together. Id. at 35. Holland testified that the dome was constructed by bolting together flanges located on the pie-shaped shell sections. The evidence demonstrated that the flanges did not meet tightly, resulting in gaps of varying widths between the shell sections.[18] At Radius' instruction, Green Eye filled the gaps with the auto body filler and coated the surface with roofing cement. Holland testified that this system was not an effective method of waterproofing an underground structure to protect it from hydrostatic pressure and water infiltration. Id. at 39. Holland testified that water was entering the dome both through its vertical joints and underneath the dome where it met at the foundation. Id. at 40-41. Holland testified as to the great lengths that would be required to make the Earthcom Dome 60 waterproof, id. at 45-47, and at the end of the day concluded that the entire structure would have to be unearthed, disassembled and reassembled in an appropriately watertight manner. Id. at 48.

Cutaia testified both during the liability and damages phases of the trial. Cutaia testified about his experience working in Manhattan on September 11, 2001 and his resulting interest in acquiring a facility in which he could protect his family from a natural or man-made calamity. Cutaia testified that in his discussions with Radius, McCarthy emphasized the importance of a structure being watertight so as to protect against radiation and biological hazards. Cutaia Trial Testimony,

---

[18] Holland noted that the bolts emanating from the inside of the dome where the sections met were of varying lengths. Holland testified that the fact that some bolts protruded into the dome further than others indicated that the shell flange sections were not joined to a uniform degree, causing him to conclude that the flanges of the dome shell sections had gaps between them of varying lengths that were filled with the bonding compound. Id. at 41-45.

Dkt. # 319, at 38, 48-49. In contrast to what he had been promised and for which he contracted, Cutaia testified that the Earthcom Dome 60 was "not useable. You can't even go in it. Forget about using it. . . . It's covered with mold. It's constant water coming in. The pieces didn't fit together. There's no way to repair it." Id. at 93. Cutaia testified that he:

> [S]pent a fortune with Stott trying to figure out where is this water coming from, what could we do? We diverted whatever water sources we could find, much further away from the dome. The $5,000 rubber liner that they made me buy that they never even installed, I had Stott put that on top and cover it with soil. I really did everything I could possibly do and it cost me a fortune. . . . It still was never able to stop the water coming in and, you know, the pieces didn't fit together. There's nothing you can do about it. They didn't fit together.

Id. at 94. When asked whether the dome could serve any alternate use, Cutaia responded:

> You can't go in it. You can't store anything in it. There's nothing you can do, you know. I had some suggestions. Fill it up with sand, collapse it, pull it out. The cost to do any of these things, to extract it and take that thing apart, it cost way more than I even paid these guys. I'm kind of stuck.

Id. at 95. Cutaia further testified:

> I think I actually paid Stott more than $100,000 and I did that because I was trying to salvage it. I was trying to figure out if there was a way I could stop the water from coming into this thing. For the millions of dollars I spent on it, I was hoping it could somehow be salvaged and used and I spent a lot of money to try to fix that because they abandoned and never came back. After all of that time and money, it still leaks, still not habitable for the purpose that I bought it for protection – protection. It's a joke.

Id. at 119. Cutaia testified that he has not been able to use the dome as a survival shelter or for any other purpose, and sought as damages from Radius "everything that I've gone out of pocket on as a result of what he put me through." Cutaia Damages Phase Testimony, Dkt. # 313, at 15. Cutaia further testified that he had another survival shelter manufacturer, Utah Shelters, visit his property and inspect the Radius shelter. Cutaia testified that their view was that the Radius shelter "wasn't

repairable."[19] Cutaia testified on cross-examination that he wished he could repair the dome, but that "[n]o one is able to guarantee me it can be fixed." Cutaia Damages Phase Testimony, Dkt. # 313, at 39. Cutaia testified that he asked Stott what it would cost to remove the dome, to which he responded that "it would be a ridiculous amount of money and I should maybe think about collapsing it or filling it with sand."[20] Id. at 41.

In addition to the water infiltration of the Earthcom Dome 60, Cutaia presented evidence that he was assured by Radius that the structure would protect his family from EMP, when, in fact, it provided minimal EMP protection. Davidson Scott, testifying for Cutaia as an expert in the field of electromagnetics, stated that the Earthcom Dome 60 did not meet military specifications for EMP protection and that the ability to receive radio signals inside the dome meant that there was no significant EMP protection. Radius' McCarthy offered little disagreement on this point, noting that reception of radio signals inside the dome "suggest[s] there's little EMP protection." McCarthy Trial Testimony, Dkt. # 320, at 60.

In contrast to Cutaia's evidence, Radius presented evidence from an engineering expert, John Mroszczy, Ph.D., about the condition of the dome and associated structures during his inspection on February 12, 2012. Mroszczy testified that while the ground was very wet outside the Earthcom Dome 60, inside it was "bone dry" and had "no odor such as you might find in a damp or a musty basement." Mroszczy Trial Testimony, Dkt. # 312, at 26. Mroszczy also testified that the circular hairline cracks in the foundation of the dome were "benign" and "not structurally compromising." Id. Mroszczy denied observing any mold inside the dome. Id. at 108. Mroszczy further testified that Radius' installation instructions called for placing hydraulic cement around the

---

[19] Although this statement made by a representative of Utah Shelters to Cutaia plainly is hearsay, the testimony was elicited on cross-examination by counsel for Radius, waiving any hearsay objection. Cutaia Damages Phase Testimony, Dkt. # 313, at 38-39.

[20] Again, this hearsay statement was elicited on cross-examination by Radius' counsel.

base of the dome, and that had that instruction been followed, no water could have infiltrated the joint between the dome and the concrete foundation.  Id. at 41-42.  Likewise, Mroszczy testified as to an instruction given to Green Eye indicating that silicone caulk be placed around the bolt heads on the flanges joining the dome section pieces.  He stated that had that instruction been followed, no water could have infiltrated the dome through the bolt holes.  Id. at 47-48.  Mroszczy also testified concerning the proper procedure for tightening the flange bolts, and indicated that any gaps between the flanges were the result of an improper sequence of bolting the flanges together.  Id. at 60-62, 128-29. Mroszczy concluded that the dome was properly designed and manufactured and that any water infiltration problems were the result of improper installation.  Id. at 67-69.  Mroszczy concluded:

> The dome is structurally sound.  It was assembled.  It has been there for two years.  There apparently at some points, there was some water infiltration for a lot of different reasons that could have occurred before the entire structure was put in place.  The easy solution is to glass the inside flange and seal the flange at the bottom.

Id. at 88.  While Mroszczy did see evidence of prior water infiltration of the dome, he attributed it to "an installation issue, not a design or manufacturing issue."  Id. at 111, 113-14.  He termed any historic water infiltration to be "very minor . . . that can be repaired," id. at 113, "by glassing the inside of the dome."  Id. at 137.

Walton McCarthy of Radius testified that the Earthcom Dome 60 was structurally sound, but that Green Eye "didn't seal it right."  McCarthy Trial Testimony, Dkt. # 320, at 91-93, 99.  McCarthy denied that the Earthcom Dome 60 needed to be dug up and testified that the dome could be sealed from the inside like any basement or boat using water-activated urethane and fiberglass. Id. at 93.  McCarthy acknowledged that the Earthcom Dome 60 leaked.  In his view, the water leaked into the dome from the bolt heads and under the foundation flange, both of which he attributed to Green Eye's installation failures. McCarthy Trial Testimony, Dkt. # 324, at 20.  During

15

the damages phase, McCarthy testified that the dome could be repaired by fiberglassing over the vertical seams and bolts and sealing the base seams with water-activated urethane foam. McCarthy Damages Phase Testimony, Dkt. # 313, at 43. McCarthy testified that any extant mold could be remediated with Clorox. Id. at 46. The total cost of the repairs to the dome according to McCarthy would be $30,000 to $35,000. Id.

On rebuttal, the installer, George Welhaf, III, of Green Eye, testified that Radius complied with all of Radius instructions concerning the installation of the Earthcom Dome 60, including applying silicone to the bolt heads and hydraulic cement around the base of the dome. Welhaf testified that Radius was fully apprised of their efforts to seal the seams of the dome sections and the bottom of the dome. Welhaf Trial Testimony, Dkt. # 321, at 39, 43, 44-45. Welhaf testified that despite Green Eye's best efforts and compliance with Radius' instructions, water leaked through the bolts and around the bottom seams. Id. at 47. Welhaf attributed the water leakage to the paint flaking off of the fiberglass dome shell sections, providing a path for water to run underneath the waterproofing he applied to the dome section joints. Id. at 61-64, 91.

### 3.

Faced with this evidence, the jury awarded damages based on the difference between the value of the contracted-for functional survival shelter and the worthless structure that was installed, rather than on the cost of repair. Plainly, the jury rejected Radius' argument that the Earthcom Dome 60 could be repaired and serve its purpose as a survival shelter.

Virginia law has long allowed a plaintiff in a breach of construction contract case to recover either under the cost or value rule. To be sure, the cost rule is the more frequently employed method of calculating damages,[21] and the one for which Radius advocated. However, this case, in

---

[21] See Nichols Constr., 276 Va. at 89-90, 661 S.E.2d at 472 ("We have observed that 'cost of correction or completion rather than loss in property value ordinarily affords the proper basis for measuring the damages which result to the

which the construction defect cannot practically be remedied, presents an exception to application of the cost rule. The jury properly used the value rule to calculate damages in these circumstances. See Barcroft Woods, 201 Va. at 410, 111 S.E.2d at 517; see also Lochaven Co., 233 Va. at 544, 357 S.E.2d at 538.

Radius argues this case presents facts analogous to the construction of a home with a leaky basement, and that the proper measure of damages is not the cost of constructing a new home, but rather the cost to fix the leak. But this analogy is inapposite. This case involved the purchase of a structure designed to protect Cutaia and his family from all manner of calamities, including those resulting from a natural disaster, nuclear strike or bioterrorism. Given the evidence that the Earthcom Dome 60 could not even keep water out, it was consistent with the evidence and reasonable for the jury to conclude that it could not serve its purpose—i.e., to protect Cutaia's family from EMP, radiation or other biohazards associated with a natural or man-made disaster.[22] In awarding damages, the jury plainly focused on the peculiar nature of the product at issue. See Nichols Constr., 276 Va. at 89, 661 S.E.2d at 472 (determination of damages in breach of contract case will always be fact-specific; "no single method exists for calculating the amount necessary to

---

owner from the breach of a building or construction contract, or other contract to change the condition of real property."' (quoting Green v. Burkholder, 208 Va. 768, 773, 160 S.E.2d 765, 768 (1968))).

[22] Thus, the myriad cases cited by Radius concerning the proper measure of damages to remedy water damage to the basement of a home do not carry the day. See, e.g., 2300 Pa. Ave., LLC v. Harkins Builders, No. 1:10-cv-1321-LOG-IDD, 2012 U.S. Dist. LEXIS 28137 (E.D. Va. Mar. 2, 2012). In those cases, the basement leaks could be repaired and the entire structure was not rendered worthless by the intrusion of water. Two things make this case different. First, the jury heard evidence that Cutaia undertook efforts to stem the flow of water into the Earthcom Dome 60 to no avail, that it continued to leak water and was moldy, and that there was no practical way to stop the flow of water without removing the massive structure from the ground and starting over. Accordingly, Cutaia was considering filling it with sand. Second, unlike in the case of a house with a leaky basement, the entire function of the Earthcom Dome 60 was undone by the intrusion of water. The Earthcom Dome 60 was not a house with a leaky basement. Its whole function was to keep Cutaia and his family safe from exposure to environmental toxins and other perils associated with a terrorist attack or natural disaster. In other words, unlike a house with a leaky basement, which retained some value as a house notwithstanding the water infiltration into the basement, Cutaia presented evidence and argued that a leaky survival shelter has no value, a conclusion which the jury obviously reached.

17

place the plaintiff in the position he would have occupied had the breach not occurred"). Substantial evidence supports the jury's decision in this regard.

In sum, Cutaia presented evidence from which the jury could reasonably conclude that the Earthcom Dome 60 structure constructed on his property could not be repaired and had no value as a survival shelter. Radius disagreed with this evidence and argued strenuously that the Earthcom Dome 60 could be repaired at a relatively modest cost. The parties' differing positions on this issue were squarely presented to the jury during both the liability and damages phase of the trial, and the jury's verdict reflects its disagreement with Radius' contention that the dome could be repaired and function as a survival shelter.[23] At this stage, the court cannot reweigh the evidence or substitute its judgment for that of the jury. The jury's ultimate conclusion that Cutaia was entitled to recover the difference between the value of the structure properly completed ($1,762,087.40) and the value of the defective structure in its current state ($0) is supported by the evidence and consistent with Virginia law— specifically, the construction cases relied on by Radius.

**B.**

Radius also takes issue with the fact that the jury awarded Cutaia his "out-of-pocket costs [which] are neither direct nor consequential damages. These damages do not constitute a 'natural and ordinary result of the breach,' but rather consist of 'out-of-pocket' costs incurred prior to and/or independent of the breach – not as a result of the breach." Radius' Rule 50(b) Br., Dkt. # 315, at 8. Radius notes that "many of these costs were incurred before the product was even delivered to the site (dome, foundation pan, composite rebar, shipping costs, core drilling), and many have no relationship to any alleged wrongdoing or breach by Radius (core drilling, tunnels,

---

[23] Thus, the case differs from the Loveland Distributing Co., Inc. v. Nelson-White Construction Management Corp., No. LH-792, 1987 WL 488753 (Richmond Cir. Ct. Oct. 30, 1987), case relied upon by Radius at oral argument involving a defective warehouse roof. There the court, sitting as the trier of fact, found overwhelming evidence that the roof could be repaired. Id. at *4. Here, in contrast, the jury's damage verdict reflects a rejection of Radius' argument that the Earthcom Dome 60 could be repaired.

septic tanks, diesel tank and barrier hatch)." Id. (citation omitted). Radius argues that this out-of-pocket damages award amounts to a windfall to Cutaia rather than reasonable compensation.

This is simply not the case. "The object of the law in awarding damages is to make amends or reparations by putting the party injured in the same position, as far as money can do it, as he would have been if the contract had been performed." Lehigh Portland Cement Co. v. Va. S.S. Co., 132 Va. 257, 270, 111 S.E. 104, 109 (1922). Putting Cutaia in the position he would have been in had the contract been performed according to its terms would require removal of the existing structure and replacement with a functional survival shelter. No evidence was adduced as to the cost to remove the existing structure, so there was no basis for the jury to award anything for the cost of removal. Thus, the jury reasonably awarded the cost of a functional survival shelter.

Nor is there any merit to Radius' argument that the damages awarded by the jury were not the result of the breach of contract in this case. In paying upwards of two million dollars, Cutaia contracted for a functional survival shelter for his family in the case of a catastrophe. In exchange for the expenditure of this vast sum, Cutaia's evidence was that he got a structure that was wholly unsuitable for this purpose and could not be salvaged. Considering the evidence in the light most favorable to him at this stage, it was reasonable for the jury to award him damages amounting to the value of the survival shelter for which he contracted and paid, but did not receive.[24]

Likewise, Radius' argument that recovery of Cutaia's costs to have the survival shelter manufactured and installed are not direct damages misses the point of Virginia law authorizing damages "which arise naturally or ordinarily from a breach of contract and which, in the ordinary

---

[24] Radius' citation of McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906, 935 (E.D.Va. 1989), for the proposition that "[d]amages which arise from problems or issues that are independent of the breach itself are not recoverable as damages resulting from the breach," Radius' Rule 50(b) Br., Dkt. # 315, at 9, is unavailing. In that case, the court concluded that Marriott did not prove that certain expenses were attributable to its breach. Here, in contrast, Cutaia presented evidence of Radius' failure to fulfill its contractual obligations and provide a functional and habitable survival shelter. Cutaia presented evidence that he was left with a sodden and moldy fiberglass and concrete structure of no use whatsoever, for which he paid nearly two million dollars. Unlike in McDevitt, there was substantial evidence from which the jury could conclude that Cutaia was damaged in the amount reflected in its award.

19

course of human experience, can be expected to result from the breach." Transdulles Ctr., Inc. v. USX Corp., 976 F.2d 219, 226 (4th Cir. 1992) (citing Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975)); see also Va. Code Ann. § 8.2-714(1) (authorizing as damages "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable"). Plainly, Cutaia's payments represent the only evidence in this case of the value of the Earthcom Dome 60 had it been constructed in accordance with the contract. The difference between the out-of-pocket expenses Cutaia incurred for the survival shelter and its present value – zero – constitutes Cutaia's direct damages. The jury's determination of the amount of the loss is reasonable and puts Cutaia "in the same position, as far as money can do it, as he would have been if the contract had been performed." Lehigh Portland Cement Co., 132 Va. at 270, 111 S.E. at 109. As such, the jury's award is consistent with Virginia law.

Finally, Radius' argument that the jury's award was excessive and out of proportion to the actual injury sustained is founded on the assumption that the Earthcom Dome 60 could be repaired as Radius' McCarthy testified. A district court may set aside a verdict as being excessive when it is "against the weight of the evidence or based on evidence which is false." Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495, 502 (4th Cir. 2007). Again, the argument that the dome could be repaired was squarely presented to and rejected by the jury in its damages award, and the court cannot revisit the jury's obvious rejection of Radius' argument. As noted above, Cutaia presented evidence that the Earthcom Dome 60 was beyond use as a survival shelter and could not be repaired. As there was evidence presented supporting the jury's verdict, the court may not set it aside.

In sum, substantial evidence supports the jury's determination that Radius breached its contract with Cutaia and that the Earthcom Dome 60 was consequently rendered useless, resulting in monetary damages in the amount of $1,762,087.40.

20

**V.**

For these reasons, Radius' Motion for Judgment as a Matter of Law (Dkt. # 315) is

**DENIED**.  By accompanying Order, a Judgment Order will be entered for Cutaia in the amount of

$1,762,087.40 as damages for breach of contract.[25]

Entered:  July 9, 2014

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

---

[25] The breach of contract claim against Radius was asserted in Count I of Second Amended Complaint.  Dkt. # 128. Because judgment will be entered only on the breach of contract count, Radius may not recover from Green Eye on a contribution claim under Virginia law.  See Va. Code Ann. § 8.01-34.  As such, Radius' cross-claim against Green Eye for contribution, Dkt. # 13, will be dismissed.

21